1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  DRANOEL ENAJ BROWN,

9                           Plaintiff,          Case No.  C16-1332-JCC-JPD

10          v.

11  KING COUNTY, *et al.*,                       REPORT AND RECOMMENDATION

12                           Defendants.

13

14                  INTRODUCTION AND SUMMARY CONCLUSION

15          This is a civil rights action proceeding under 42 U.S.C. § 1983.  Plaintiff Dranoel Brown

16  is a state prisoner who is currently incarcerated at the Coyote Ridge Corrections Center in

17  Connell, Washington.  Plaintiff's civil rights claims arise out of a previous period of

18  incarceration at the King County Regional Justice Center (RJC) in Kent, Washington.  Plaintiff

19  asserts in his third amended complaint, the operative complaint in this action, that defendants

20  violated his rights under the Eighth and Fourteenth Amendments, and denied him reasonable

21  accommodation under the Americans with Disabilities Act, when they refused to provide him

22  with a wheelchair despite the fact that he was unable to walk or bear weight on either leg, and

23  when they failed to provide accessible transportation thereby causing him to miss multiple court

REPORT AND RECOMMENDATION - 1

1  dates in a child dependency proceeding.  Plaintiff identifies King County, Sergeant Merritt,

2  Sergeant Hansen, Dr. Rogers (Roger Higgs), RNS Pam (Pam Krogh), Kerri Maccini, RNS David

3  (David Pasoquen), and Nancy Ledgerwood[1] as defendants in this action.  Plaintiff seeks $9

4  million in damages.

5         Defendants now move for summary judgment.  Plaintiff has filed papers in opposition to

6  defendants' motion, and defendants have filed a reply brief in support of their motion.  Also

7  pending at this time are defendants' motions to strike various documents filed by plaintiff,

8  plaintiff's motion to proceed to trial, plaintiff's motion for an extension of the deadline to

9  respond to defendants' summary judgment motion, plaintiff's motion for discovery, and

10  plaintiff's motion for preliminary injunctive relief.  The Court, having reviewed all pending

11  motions, all briefing relating to these motions, and the balance of the record, concludes that

12  defendants' motion for summary judgment should be granted and plaintiff's third amended

13  complaint and this action should be dismissed with prejudice.  This Court also concludes that

14  defendants' motions to strike documents should be granted in part and denied in part, that

15  plaintiff's motions to proceed to trial, for an extension of time, and for preliminary injunctive

16  relief should be denied as moot, and that plaintiff's motion for discovery should be stricken.

17  <div align="center">FACTS</div>

18  **1.  *Medical Issues***

19         Plaintiff was arrested on September 17, 2015 and booked into the King County

20  Correctional Facility (KCCF) in Seattle.  (Dkt. 96 at 2, ¶ 2.)  Plaintiff was subsequently

21  transferred to the Regional Justice Center (RJC) detention facility in Kent.  (*Id*.)  At the time of

---

[1]  Plaintiff named Catherine Schroeder as a defendant in his third amended complaint, but was subsequently permitted to substitute Nancy Ledgerwood for Ms. Schroeder.  (*See* Dkt. 82 at 1-2.)

REPORT AND RECOMMENDATION - 2

his booking, plaintiff reported that he had injured his knee, apparently while running from the police, and that he was in pain and could not walk using the injured leg.  (*See* Dkt. 96 at 2, ¶ 2; Dkt. 105 at 31.)  Plaintiff was given crutches and scheduled for a clinic visit, and he was assigned to general population.[2]  (*Id*.)  After being transferred to the RJC on September 21, 2015, plaintiff was provided a wheelchair for ambulation pending x-rays and evaluation of his knee injury.  (Dkt. 94 at 2, ¶ 4; Dkt. 105 at 8; Dkt. 106 at 11.)  X-rays were taken on September 23, 2015, and they revealed no fracture.  (Dkt. 94 at 2, ¶ 4.)

On October 16, 2015, Nancy Ledgerwood, an advanced registered nurse practitioner (ARNP), saw plaintiff to determine why he was refusing to walk or use crutches, and was still using a wheelchair, given that his x-rays showed his knee was normal.  (Dkt. 99 at 2, ¶ 5.)  After examining plaintiff, ARNP Ledgerwood determined that a wheelchair was not appropriate for plaintiff and she gave him crutches and a long leg brace to use instead.  (*Id*. at 2, ¶ 6.)  ARNP Ledgerwood showed plaintiff how to walk with the crutches, how to put the brace on, and how to do quadricep tightening exercises to maintain his leg strength.  (*Id*.)  Finally, Ms. Ledgerwood ordered ibuprofen for plaintiff and advised him she would make an appointment with an orthopedist for evaluation of his left leg.  (*Id*.)

On November 2, 2015, plaintiff reported to medical staff that he had fallen with his crutches and that his left knee hurt.  (*See* Dkt. 98 at 2; Dkt. 105 at 36.)  Plaintiff was evaluated by Registered Nurse (RN) Christopher Boyd who saw no signs of abrasion, no contusions, and no deformity of plaintiff's left knee.  (Dkt. 105 at 36.)  According to the triage note, plaintiff was calm and showed no signs of pain until the skin over his knee was touched with no pressure

---

[2] The booking form indicates that plaintiff requested to be put in general population, though plaintiff now appears to dispute this.  (*See* Dkt. 105 at 5, 31.)

REPORT AND RECOMMENDATION - 3

applied.  (*Id.*)  Plaintiff was able to stand without assistance and had good range of motion.  (*Id.*)

RN Boyd ruled out a fall, but did offer to provide plaintiff with a walker for more stability.  (Dkt.

105 at 36.)  Plaintiff refused the walker.  (*Id.*)  On November 6, 2015, four days after his

purported fall, ARNP Ledgerwood saw plaintiff in his housing unit after he was called to the

clinic but refused to go.  (Dkt. 99 at 3, ¶ 7.)   According to ARNP Ledgerwood, plaintiff had just

come from "yard out," his recreation time, and he was walking without a limp using crutches.

(Dkt. 99 at 3, ¶ 7.)

On February 1, 2016, an MRI was conducted of plaintiff's left knee at Harborview

Medical Center (HMC).  (Dkt. 59 at 20; Dkt. 114 at 2, ¶ 3.)  The MRI revealed a complete tear of

the anterior cruciate ligament of plaintiff's left knee, a closed fracture of the lateral condyle of

the left distal femur, derangement of the posterior horn of the lateral meniscus of the left knee,

and patellofemoral stress syndrome of the left knee.[3] (*Id.*)

On March 19, 2016, plaintiff submitted both a medical kite and a medical grievance,

stating in each that his legs hurt while walking with crutches, and requesting that he be provided

pain medication and a wheelchair.  (Dkt. 59 at 18-19; Dkt. 94 at 3, ¶ 7.)  The nurse who

responded to plaintiff's kite, RN Pam, advised plaintiff to file a grievance since his request for a

wheelchair had already been considered and denied, and his pain had been managed.  (Dkt. 59 at

18.)  The supervisor who responded to plaintiff's grievance, Kerri Maccini, advised plaintiff to

submit a kite to request services.  (*Id.* at 19.)

On May 4, 2016, plaintiff appealed Ms. Maccini's grievance response, noting that "Nurse

Pam" had advised him to submit the grievance instead of a kite.  (*Id.*)  On the same day, plaintiff

---

[3]  The MRI was originally scheduled for January 12, 2016, but plaintiff was in court that day and the appointment therefor had to be rescheduled.  (*See* Dkt. 114 at 2, ¶ 3.)

REPORT AND RECOMMENDATION - 4

1  submitted another medical grievance, again complaining about knee pain and the refusal of the

2  medical staff to provide a wheelchair or pain medication.  (Dkt. 59 at 17.)  Ms. Maccini

3  responded to the grievance appeal and to plaintiff's second grievance on May 16, 2016, advising

4  plaintiff that the issues raised therein had been discussed with him during his appointment with

5  Dr. Higgs on May 11, 2016.  (*Id*. at 19.)

6       During that appointment on May 11, 2016, Dr. Higgs explained to plaintiff that he should

7  not use a wheelchair because it could result in muscle atrophy and weakening of plaintiff's legs.

8  (Dkt. 94 at 3, ¶ 8.)  When plaintiff expressed concern about his right knee during his appointment

9  with Dr. Higgs, Dr. Higgs explained that imaging of the right knee would be determined by the

10 orthopedic consult.  (*Id*. at 3, ¶¶ 8-9.)  That consult was scheduled to take place later the same

11 day at HMC.  (*Id*.)

12      Plaintiff was advised by the physician at the HMC Ortho-Trauma Clinic that he would be

13 willing to refer plaintiff to sports medicine for surgery, though he thought it unlikely plaintiff

14 would find a surgeon willing to perform anterior cruciate ligament reconstruction while plaintiff

15 was incarcerated because he would not be able to participate in the aggressive post-operative

16 physical therapy necessary for a successful outcome of such surgery.  (*See* Dkt. 59 at 28.)

17 Plaintiff was further advised to avoid physical activities involving pivoting and jumping, but was

18 told he could participate in activities involving straightforward running.  (*Id*.)  Plaintiff was fitted

19 with a range of motion brace at HMC and was told that the non-steroidal anti-inflammatory

20 medications he was then taking were most appropriate given that the injury had occurred

21 approximately nine months prior.  (*Id*.)

22      Subsequently, on June 24, 2016, plaintiff discussed the HMC consultation with a nurse

23 practitioner at the RJC.  (*See* Dkt. 59 at 28; Dkt. 94 at 4, ¶ 10.)  Plaintiff indicated to the nurse

REPORT AND RECOMMENDATION - 5

practitioner that his right knee also felt unstable and was painful, but plaintiff couldn't recall if he had mentioned that to the HMC physician during the consult as Dr. Higgs had suggested he do. (*See* Dkt. 59 at 28; Dkt. 94 at 4, ¶ 10.)  The nurse practitioner referred plaintiff to the HMC sports medicine clinic for re-evaluation, but the specialists declined to see plaintiff because he was not a good candidate for surgery. (*See* Dkt. 94 at 4, ¶ 10.)  They instead recommended pain management and decreasing further injury by avoiding activities that involved any type of aggressive turning. (*Id.*)

### 2.    *Transportation Issues*

In addition to the criminal case pursuant to which plaintiff was confined, plaintiff was also involved in a civil dependency case in King County in 2015. (*See* Dkt. 59 at 10; Dkt. 96 at 2, ¶ 3.)  A hearing in that matter was scheduled for September 22, 2015 in Seattle. (*See id.*)  Plaintiff, who was by that time confined at the RJC in Kent, was placed on the list of inmates to be transported to Seattle, but plaintiff did not arrive on the bus. (*Id.*)  The civil court was notified and the hearing was continued to September 23, 2015. (*See id.*)  Plaintiff once again failed to arrive on the bus, and the hearing was once more continued, this time to September 29, 2015. (*See id.*)

On the afternoon of September 23, 2015, plaintiff's mother contacted the King County Office of Civil Rights ("OCR") and claimed that plaintiff was disabled and the King County Department of Adult and Juvenile Detention (DAJD) was not providing accessible transportation for him to get to the dependency hearing. (*See* Dkt. 59 at 16; Dkt. 93 at 3, ¶ 10.)  On September 29 and September 30, OCR contacted the DAJD and the court respectively regarding plaintiff's transportation issues and his inability to get to the dependency hearing. (Dkt. 59 at 13, 14.)  Plaintiff's attorney in his dependency proceedings also contacted the prosecuting attorney's

REPORT AND RECOMMENDATION - 6

1    office, apparently on September 29, expressing concern about the DAJD's unwillingness to

2    provide a cabulance for plaintiff's transport to the court proceedings.  (Dkt. 59 at 10.)

3        Though there was nothing in plaintiff's corrections records to indicate that he would have

4    been unable to be transported using the regular bus or van, when it became clear that plaintiff

5    would not, or could not, be transported in that fashion, the DAJD contracted for a cabulance and

6    plaintiff was transported to Seattle for the next scheduled dependency hearing on October 2,

7    2015.  (Dkt. 96 at 3, ¶¶ 7-8.)

8                                            DISCUSSION

9        Defendants argue that summary judgment is warranted because they were not

10   deliberately indifferent to plaintiff's medical needs, nor did they discriminate against plaintiff

11   denying him services based on his alleged disability.  (*See* Dkt. 92.)  Plaintiff disputes

12   defendants' arguments and asks that summary judgment be denied.  (*See* Dkts. 105, 106.)

13                                 Summary Judgment Standard

14       Summary judgment is appropriate when a "movant shows that there is no genuine dispute

15   as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

16   56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party

17   fails to make a sufficient showing on an essential element of his case with respect to which he

18   has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving

19   party bears the initial burden of showing the district court "that there is an absence of evidence to

20   support the nonmoving party's case."  *Id.* at 325.  The moving party can carry its initial burden

21   by producing affirmative evidence that negates an essential element of the nonmovant's case, or

22   by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of

23   persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102

REPORT AND RECOMMENDATION - 7

(9th Cir. 2000).  The burden then shifts to the nonmoving party to establish a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable inferences in favor of the nonmoving party.  *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585.  "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).  "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

REPORT AND RECOMMENDATION - 8

1

### Section 1983 Standard

2      In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that

3 he suffered a violation of rights protected by the Constitution or created by federal statute, and

4 (ii) that the violation was proximately caused by a person acting under color of state law.  *See*

5 *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is

6 satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in

7 another's affirmative act, or omitted to perform an act which he was legally required to do that

8 caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981)

9 (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

10      A local government unit or municipality can be sued as a "person" under § 1983.  *Monell*

11 *v. Department of Social Servs., of City of New York*, 436 U.S. 658, 691 (1978).  However, a

12 municipality cannot be held liable under § 1983 solely because it employs a tortfeasor.  *Id*.  A

13 plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal

14 "policy" or "custom" that caused his or her injury.  *Bryan County Commissioners v. Brown*, 520

15 U.S. 397, 403 (1997) (citing *Monell* 436 U.S. at 694).

### Inadequate Medical Care

16

17      Plaintiff asserts that defendants violated his rights under the Eighth and Fourteenth

18 Amendments when they failed to provide a wheelchair and surgery for his injured knee.  (*See*

19 Dkt. 59 at 3, 5-6.)  Plaintiff claims that he was forced to walk on crutches for 12 months while in

20 DAJD custody despite the fact that his legs were seriously injured and he could not bear any

21 weight on either leg.  (*See id*.)  This claim implicates all seven of the individual defendants

22 identified in this action including Dr. Roger Higgs, RN Pam Krogh, RN David Pasoquen, Kerry

23 Maccini, ARNP Nancy Ledgerwood, Sergeant Stephanie Hansen, and Sergeant Merritt.

REPORT AND RECOMMENDATION - 9

1   It appears that the conduct which gives rise to plaintiff's claims against these seven

2   defendants occurred while plaintiff was a pretrial detainee at the RJC.  Thus, plaintiff's rights

3   derive from the Due Process Clause of the Fourteenth Amendment and not from the Eighth

4   Amendment's prohibition against cruel and unusual punishment.  *Bell v. Wolfish*, 441 U.S. 520,

5   535 (1979).  Claims for violations of the right to adequate medical care under the Fourteenth

6   Amendment must be evaluated under an objective deliberate indifference standard.  *Gordon v.*

7   *County of Orange*, No. 16-56005, 2018 WL 1998296, at *5 (9th Cir. Apr. 30, 2018).  The

8   elements of such a claim are:  "(i) the defendant made an intentional decision with respect to the

9   conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at

10  substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available

11  measures to abate that risk, even though a reasonable official in the circumstances would have

12  appreciated the high degree of risk involved—making the consequences of the defendant's

13  conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's

14  injuries."  *Id.*

15  A pretrial detainee who asserts a due process claim for failure of a state official to

16  provide adequate medical care must "prove more than negligence but less than subjective

17  intent—something akin to reckless disregard," as a mere lack of due care does not deprive an

18  individual of life, liberty or property under the Fourteenth Amendment.  *Gordon*, 2018 WL

19  1998296, at *5 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

20  A mere difference of opinion concerning proper medical care is not sufficient to establish

21  deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Sanchez v.*

22  *Vild*, 891 F.2d 240, 242 (9th Cir. 1989)).

23

REPORT AND RECOMMENDATION - 10

1    ### 1.    *ARNP Ledgerwood and Dr. Higgs*

2    Defendants concede that plaintiff's knee injury constituted a serious medical need, but

3    they deny they were deliberately indifferent to that need.  ARNP Ledgerwood and Dr. Higgs

4    both evaluated plaintiff and concluded that a wheelchair was not appropriate for plaintiff because

5    it would result in muscle atrophy and weakening of plaintiff's legs.  (*See* Dkt. 94 at 3, ¶ 8; Dkt.

6    99 at 2, ¶¶ 5-6.)  ARNP Ledgerwood states in in her declaration in support of summary judgment

7    that ligament injuries often heal with time and conservative treatment, thereby avoiding the need

8    for surgery, and that maintaining leg strength facilitates that healing process.  (*See* Dkt. 99 at 2,

9    ¶¶ 5-6.)

10    ARNP Ledgerwood further states that throughout her contacts with plaintiff, to the extent

11    he needed a mobility device at all, crutches were "medically appropriate."  (*Id*. at 3, ¶ 8.)

12    Similarly, Dr. Higgs states in his declaration in support of summary judgment that based on his

13    review of plaintiff's medical records, and his observations of plaintiff, plaintiff was ambulatory

14    with crutches, and that crutches were appropriate.  (Dkt. 94 at 4, ¶ 11.)  The orthopedist whom

15    plaintiff saw at HMC likewise did not prescribe a wheelchair but, instead, provided a brace and

16    advised plaintiff of which physical activities were acceptable and which to avoid.  (*See* Dkt. 59 at

17    28.)  The clear inference is that the HMC specialist considered plaintiff to be ambulatory as well.

18    While plaintiff maintains that he should have been provided a wheelchair to

19    accommodate his injury, he fails to demonstrate that a wheelchair was medically necessary or

20    that withholding a wheelchair caused him any serious harm.  Plaintiff provides documentation

21    from the Washington Department of Corrections showing that he has been allowed to use a

22    wheelchair in his current custodial circumstances.  (*See* Dkt. 59 at 31.)  However, this

23

REPORT AND RECOMMENDATION - 11

demonstrates, at most, a difference of opinion regarding the proper treatment of plaintiff's injury which is not sufficient to establish a federal constitutional violation.

Defendants did not fail to treat plaintiff's knee injury, they merely adopted a conservative approach which involved provision of crutches, a brace, pain medication, and instruction on how to strengthen muscles to promote healing.  This approach was effectively validated by the HMC specialist who made clear that plaintiff was not a good candidate for surgery given his incarceration.  Plaintiff has not established that ARNP Ledgerwood or Dr. Higgs were deliberately indifferent to his serious medical needs and, thus, these two defendants are entitled to summary judgment.

### 2.    *Kerry Maccini and RN Pam*

Plaintiff claims that medical staff members Kerry Maccini and RN Pam sent him in "a perpetual cycle of asking and being denied Accomodations [sic] for my disability of the injuries to my legs which require the use of a wheelchair." (Dkt. 59 at 5.)  At issue here are a medical kite and a medical grievance, both submitted on March 19, 2016, in which plaintiff complained of pain in both legs and expressed his need for a wheelchair.  (*See id*. at 18-19.)  RN Pam responded to plaintiff's kite and suggested that plaintiff file a grievance because a kite wouldn't help at that point.  (*Id*. at 18.)  Ms. Maccini responded to plaintiff's grievance and advised plaintiff to submit a kite for services.  (*Id*. at 19.)

While understandably frustrated by the contradictory advice from RN Pam and Ms. Maccini, plaintiff fails to demonstrate that this amounts to deliberate indifference.  Though the record is not clear on this point, it appears that plaintiff's appointment with Dr. Higgs in May 2016 was scheduled after he appealed Ms. Maccini's grievance response directing him to submit a kite.  Dr. Higgs essentially confirmed ARNP Ledgerwood's October 2015 determination that a

REPORT AND RECOMMENDATION - 12

wheelchair was not appropriate. Plaintiff was seen the same day by the HMC specialist, an appointment apparently made pursuant to a request by ARNP Ledgerwood in October,[4] and the specialist also effectively confirmed that a wheelchair was not necessary. The apparent confusion over whether it was most appropriate for plaintiff to submit a kite or file a grievance to convey his desire for a wheelchair did not expose plaintiff to any risk of harm as a treatment plan had been established for plaintiff in October 2015, and there was no deviation from that plan after plaintiff saw Dr. Higgs and the HMC specialist in May 2016. Plaintiff fails to demonstrate that the conduct of Kerry Maccini or RN Pam violated his federal constitutional rights and, thus, these two defendants are entitled to summary judgment.

### 3.    Sergeant Merritt and Sergeant Hansen

Plaintiff claims that while confined in general population, he was unable to walk most days, and missed "many" dependency hearings, and that when he told Sergeant Merritt and Sergeant Hansen about these difficulties they failed to call an emergency code as policy requires. (Dkt. 59 at 3.) Defendants argue that plaintiff's claims against Sergeant Merritt and Sergeant Hansen are meritless, but must also be dismissed because plaintiff failed to exhaust his remedies under the Prison Litigation Reform Act. (*See* Dkt. 92 at 14-15.)

Section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Section 1997e(a) requires *complete* exhaustion through any available process. *See Porter v. Nussle* 534 U.S. 516, 524 (2002) ("All

---

[4] ARNP Ledgerwood advised plaintiff in October 2015 that she would make an appointment for him to see an orthopedist, but she also warned that it would take a while to get the appointment. (*See* Dkt. 99 at 2-3, ¶ 6.)

REPORT AND RECOMMENDATION - 13

1  'available' remedies must now be exhausted."); *Booth v. Churner*, 532 U.S. 731, 735 (2001).

2  Section 1997e(a) also requires *proper* exhaustion. *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).

3  "Proper" exhaustion means full compliance by a prisoner with all procedural requirements of an

4  institution's grievance process. *See id*. at 93-95. A prisoner who submits a complaint containing

5  both exhausted and unexhausted claims may proceed only with respect to the exhausted claims,

6  and any unexhausted claims must be dismissed. *See Jones v. Bock*, 549 U.S. 199, 219-223

7  (2007).

8      The DAJD has an established grievance process. (*See* Dkt. 100.) Written grievances,

9  once submitted by an inmate, are logged into a database by the grievance coordinator and are

10  then assigned to a staff member for a response. (*Id*. at 1-2.) The inmate is provided a written

11  response to the grievance, and the inmate may appeal the decision. (*Id*. at 2.) The written

12  response to the grievance appeal is considered final. (*Id*.)

13      The record reflects that on May 4, 2016, plaintiff submitted a non-medical grievance in

14  which he claimed he had told the medical staff he needed a wheelchair because he was

15  experiencing severe pain in both legs while walking with crutches. (Dkt. 59 at 22.) He also

16  claimed he was not getting any pain medication from the doctors. (*Id*.) Plaintiff indicated in his

17  grievance that he had discussed his concerns with Sergeant Merritt, but that Sergeant Merritt said

18  he could not help.[5] (*Id*.) Plaintiff asked that he be provided pain medication and a wheelchair.

19  (*Id*.)

20      Administrative Specialist Greg Hanson responded to the grievance on May 6, 2016,

21  advising plaintiff that because he had raised a medical issue, he would need to fill out a medical

22       [5] As noted by defendants in their summary judgment motion, it is difficult to tell whether plaintiff was

23  grieving Sergeant Merritt's inability to help, or the medical's staff's failure to provide what plaintiff believed to be necessary care.

REPORT AND RECOMMENDATION - 14

grievance.  (Dkt. 59 at 23.)  The copy of the May 6 grievance submitted as an exhibit to plaintiff's third amended complaint shows that plaintiff filled out the appeal section of the grievance form and, in the final response/decision section, he wrote "Sargeant hanson [sic] gave this back without response."  (*Id*.)  However, according to Andrea Williams, the Records and Information Systems Manager at the DAJD, plaintiff did not appeal any grievance in 2016.  (Dkt. 100 at 2, ¶ 9.)  Plaintiff offers no evidence to the contrary.

The May 4, 2016 grievance appears to have been plaintiff's only attempt to grieve any conduct of Sergeant Merritt and Sergeant Hanson related to the issues raised by plaintiff in his third amended complaint.  As the record make clear that plaintiff failed to exhaust the remedies available to him under the DAJD grievance process with respect to that grievance, plaintiff's claims against Sergeant Merritt and Sergeant Hansen must be dismissed.

### 4.    *RN David*

Plaintiff claims that RN David Pasoquen refused to provide him with a wheelchair after plaintiff fell on his crutches on November 2, 2015, and "mocked" him by offering a walker instead.  (Dkt. 59 at 5-6.)  Defendants present no argument in their summary judgment motion pertaining to RN Pasoquen, though they did submit in support of their motion a declaration from RN Pasoquen in which he states that it was another nurse, RN Christopher Boyd, who offered plaintiff the walker on November 2, 2015 after ruling out a fall.  (*See* Dkt. 98.)  While plaintiff insists that RN Pasoquen was present and "did all the talking and all the examining of my legs, while Christopher Boyd said nothing" (*see* Dkt. 102 at 6-7), plaintiff offers no actual evidence to support this assertion.

Plaintiff provides documents showing that RN Pasoquen was previously reprimanded by DAJD superiors for inappropriate and unprofessional conduct.  (*See* Dkt. 105 at 46-47.)

REPORT AND RECOMMENDATION - 15

1    However, these documents do not establish that RN Pasoquen was the treating nurse on

2    November 2, 2015.  Because plaintiff offers no evidence that RN Pasoquen personally

3    participated in the conduct complained of in plaintiff's third amended complaint, plaintiff's

4    claims against RN Pasoquen must be dismissed.

5                                    Transportation Issues

6            In addition to his claims challenging the adequacy of the medical care provided to him

7    while in DAJD custody, plaintiff also claims that he missed multiple court dates because of

8    "defendants [sic] policy" of forcing inmates who are in restraints and on crutches to climb stairs

9    on its buses and vans, or be left behind.  (*See* Dkt. 59 at 8-9.)  Plaintiff was apparently "left

10   behind" on three occasions when he was to be transported to court for civil dependency hearings,

11   but was unwilling or unable to board the transport bus, and more accessible transportation was

12   not available.  (*See id*. at 9-16.)  The Court construes this claim as implicating only defendant

13   King County because plaintiff does not allege that any of the individual defendants caused the

14   harm alleged in this portion of his pleading.  The Court also construes this claim as asserting

15   only a violation of the Americans with Disabilities Act as plaintiff does not specifically allege in

16   relation to the transportation issues any violation of a federal constitutional right.

17           Defendants argue that all claims relating to transportation issues must be dismissed for

18   failure to exhaust administrative remedies because plaintiff never filed any grievance referencing

19   the alleged failure to transport him to the dependency hearings, or alleging any violation of the

20   ADA.  (Dkt. 92 at 17.)  The record appears to confirm that plaintiff did not file a grievance with

21   the DAJD to address his claims concerning the missed dependency hearings.  However, both

22   plaintiff's mother and his attorney in the dependency proceedings raised concerns regarding the

23   transportation issues in separate submissions to King County authorities.  (*See* Dkt. 59 at 10-16.)

REPORT AND RECOMMENDATION - 16

The documentation in the record makes clear that these concerns were conveyed to the DAJD and that actions were taken to address the concerns. (*See id*.) As a result, plaintiff was transported to a dependency hearing that had been rescheduled for October 2, 2015.

The Supreme Court has explained that the exhaustion requirement serves two main purposes: (1) it protects "administrative agency authority" by giving an agency the opportunity to correct its own mistakes with respect to the programs it administers; and, (2) it promotes efficiency because claims can generally be resolved more quickly and economically in administrative proceedings. *See Woodford*, 548 U.S. at 89. While it is clear that plaintiff did not comply with the technical requirements for exhaustion because he failed to grieve the issue directly with DAJD, the issue was nonetheless addressed and resolved by the DAJD once it was brought to the attention of the DAJD through outside channels. Thus, in this Court's view, plaintiff's transportation claim as it relates to the three missed dependency hearings is arguably exhausted. To the extent plaintiff seeks to challenge other alleged transportation issues which arose during the course of his confinement in the DAJD, his claims have not been exhausted and will not be considered.

Title II of the ADA provides in pertinent part that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. For purposes of the ADA, an individual with a disability is one who: (1) has a physical or mental impairment which substantially limits one or more of his/her major life activities; (2) has a record of such an impairment; and, (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2)

REPORT AND RECOMMENDATION - 17

In order to prove an ADA claim, a plaintiff must demonstrate that: (1) he is a handicapped person; (2) he is otherwise qualified; and that defendants' actions either (3) excluded his participation in or denied him the benefits of a service, program, or activity; or (4) otherwise subjected him to discrimination based on a physical disability. *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996). To recover monetary damages under Title II of the ADA, a plaintiff must prove intentional discrimination on the part of the defendant under a deliberate indifference standard. *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001). "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Id*. at 1139.

There is no evidence in the record that plaintiff was denied the benefits of a service or that plaintiff was discriminated against based on his physical disability. The record appears to confirm that plaintiff missed three court dates in September 2015 (September 22, 23 and 29)[6] because wheelchair accessible transportation was not available. At the time of those hearings, plaintiff was using the wheelchair which had been temporarily provided to him at the RJC pending further assessment of his knee injury. However, there was nothing in plaintiff's corrections records indicating that he was not ambulatory or that he would have been unable to board a bus or van for transport. (*See* Dkt. 96 at 3, ¶ 7.)

According to Corrections Captain Roberta Johnson, the DAJD official in charge of the court detail unit at times relevant to this action, inmates using crutches, a brace, or even a wheelchair can usually be transported via a regular bus or van as long as the inmate is able and

---

[6] It is important to note that on each occasion, the hearing was continued when plaintiff failed to arrive so no hearing was conducted in plaintiff's absence.

REPORT AND RECOMMENDATION - 18

willing to get out of the wheelchair to board and exit the transport vehicle.[7]  (*See* Dkt. 96 at 3, ¶

7.)  When it is medically impossible to use a regular bus or van for transportation, the DAJD

contracts for a cabulance as the DAJD does not have its own cabulance.  (*Id.*)  This requires

advance notice of the hearing and of the need for special transportation.  (*See* Dkt. 96 at 3, ¶ 7.)

Such advance notice was not provided for either the September 22 or the September 23 hearings

because it was apparently unclear at that juncture that plaintiff required specialized

transportation.  (*See id.* at 2-3, ¶¶ 3, 4.)  The record suggests that as of the September 29 hearing

date, the court detail still did not have either sufficient clarity regarding plaintiff's transportation

needs or sufficient advanced notice to arrange for alternative transportation.  (*See id.* at 3, ¶ 5.)

Once it became clear that plaintiff was unable or unwilling to be transported via the regular

transport options, arrangements were made to transport plaintiff to Seattle via cabulance for the

next scheduled hearing on October 2, 2015.  (*Id.* at 3, ¶ 6.)

These facts, at most, establish a lack of effective communication within the DAJD.

Plaintiff was not ultimately denied any service, provision of that service was simply delayed

while DAJD determined what plaintiff's specific needs were.  The record is also devoid of any

evidence of intentional discrimination by the DAJD.  As Captain Johnson notes, there was no

indication in plaintiff's corrections records that he would not have been able to transfer himself

between a bus or van and a wheelchair.  (*See* Dkt. 96 at 3, ¶ 3; Dkt. 115 at 2, ¶ 2.)  Because the

evidence in the record suggests that those responsible for transporting plaintiff to court for the

dependency hearing did not know he was disabled to the extent that specialized transportation

---

[7] Captain Johnson disputes plaintiff's assertion that inmates on crutches are shackled at the hands, waist and feet and are then forced to go up the vehicle steps while shackled.  (Dkt. 115 at 2, ¶ 2.)  Captain Johnson maintains that while all inmates must be restrained during transport, they are not restrained in a manner that prevents them from boarding transportation. (*Id.*)

1    was required, the failure to provide such transport does not amount to deliberate indifference.

2    Plaintiff's claim that his rights under the ADA were violated when the DAJD failed on three

3    occasions to transport him to court for the dependency hearing is without merit and defendant

4    King County is therefore entitled to summary judgment with respect to plaintiff's ADA claim.

Other Pending Motions

5

6    Defendants have filed two motions to strike various documents submitted by plaintiff.  In

7    the first motion, which was included in defendants' motion for summary judgment, defendants

8    move to strike ten "declarations" submitted by plaintiff in October and November 2017.  (*See*

9    Dkt. 92 at 7-8.)  At issue are plaintiff's declaration in opposition to defendants' summary

10   judgment motion (Dkt. 62), the declaration of Jason Jura (Dkt. 63), the declaration of Tara Urs

11   (Dkt. 66), the declaration of Roxanne Viella (Dkt. 67), the declaration of Jorenda Procter (Dkt.

12   68), the declaration of plaintiff against Heidi Jacobsen-Watts (Dkt. 69), the declaration of

13   Nicholas Laird (Dkt. 70), the declaration of plaintiff in opposition to defendants' summary

14   judgment motion (Dkt. 71), the declaration of plaintiff against Dr. Rogers (Dkt. 86), and the

15   declaration of plaintiff against Nancy Ledgerwood and David Pasoquen (Dkt. 87).

16   It appears that most, if not all, of these declarations were filed in response to defendants'

17   original summary judgment motion which was filed on September 15, 2017 and was stricken

18   when plaintiff was granted leave to file his third amended complaint.  (*See* Dkts. 49, 58.)

19   Defendants argue that the declarations must now be stricken because they are not responsive to

20   anything.  (*See* Dkt. 92 at 8.)  Plaintiff opposes the motion to strike, claiming that he is unable to

21   produce the same documents again because he has been moved twice and he is unable to find the

22   exact documents which comprise the declarations.  (Dkt. 103.)  He also appears to suggest that if

23

REPORT AND RECOMMENDATION - 20

the Court were to order the declarations stricken, he would simply retrieve the previously filed declarations from the Court and re-submit them. (*See* Dkt. 103)

The Court first notes that plaintiff has already re-submitted a majority of the declarations at issue here in his opposition papers to defendants' re-filed summary judgment motion. The original declarations (Dkts. 62, 66, 67, 68, 70, 71, 87) therefore serve no purpose and are properly stricken from the record.[8] The only documents which were not re-submitted appear to be the declaration of Jason Jura, the declaration of plaintiff against Heidi Jacobsen-Watts, and the declaration of plaintiff against Dr. Rogers. Plaintiff's declarations against Ms. Jacobsen-Watts and Dr. Rogers (Dkts. 69, 86) are not true declarations but are effectively briefs in opposition to the declarations submitted by these individuals in support of defendants' original summary judgment motion.[9] While the Court can understand that it may be difficult for plaintiff to reproduce or recreate a misplaced declaration from another individual, such as the one submitted by Jason Jura (Dkt. 63), plaintiff could have readily recreated his own arguments in opposition to defendants' re-filed summary judgment motion. Accordingly, this Court recommends that defendants' motion to strike plaintiff's declarations be GRANTED with respect to Dkts. 62, 66-71 and 86-87, and denied with respect to Dkt. 63.

Defendants' second motion to strike (Dkt. 117) seeks to strike a declaration and exhibits submitted by plaintiff after all permissible briefing on defendants' summary judgment motion had been received and the noting date had passed. As defendants correctly note, pursuant to Local Civil Rule (LCR) 7, all briefing in relation to any given motion must be filed prior to the

---

[8] To the extent plaintiff claims he cannot reproduce the remaining documents because they were essentially lost in transit, the Court notes that at the time plaintiff filed the declarations he was confined in the same facility where he currently resides. This argument therefore appears frivolous

[9] As noted above, Dr. Rogers is, in fact, Dr. Roger Higgs.)

noting date of the motion with the exception of a sureply filed in accordance with LCR 7(g), or

supplemental authority filed in accordance with LCR 7(n).  It is clear that plaintiff's declaration

(Dkt. 116), which consists of five pages of what plaintiff believes to be relevant "facts" and 23

pages of exhibits, is not a permissible sureply under LCR 7(g) because it does not request that

materials contained in or attached to defendants' reply brief in support of summary judgment be

stricken.  LCR 7(g)(2) makes clear that a sureply filed for any other reason will not be

considered.  Likewise, plaintiff's declaration contains no supplemental authority and therefore is

not permitted under LCR 7(n).  Because plaintiff's most recent declaration (Dkt. 116) is

improper under the rules of this Court, defendants' motion to strike the declaration (Dkt. 117)

should be GRANTED.

Plaintiff has also filed several motions including a motion to proceed to trial, a motion for

an extension of the deadline to file a response to defendants' summary judgment motion, and a

motion for discovery.  Plaintiff filed his motion to proceed to trial (Dkt. 90) approximately one

month before defendants re-filed their summary judgment motion in February 2018 (Dkt. 92).

Plaintiff does not seek summary judgment in his motion, he merely suggests that the facts he has

established warrant a trial.  Plaintiff provides no legal basis for his motion and, in any event, the

Court has now considered the facts offered by plaintiff in the context of defendants' summary

judgment motion and has concluded that plaintiff has not established any genuine issue of

material fact for trial.  Accordingly, plaintiff's motion to proceed to trial (Dkt. 90) should be

denied as moot.

With respect to plaintiff's motion for an extension of the deadline to file a response to

defendants' summary judgment motion (Dkt. 111), the Court notes that plaintiff filed a timely

response to defendants' motion on March 5, 2018 (*See* Dkts. 105, 106).  Plaintiff's motion for an

REPORT AND RECOMMENDATION - 22

1    extension of time is therefore denied as moot.  With respect to plaintiff's motion for discovery

2    (Dkt. 119), the Court notes that the document contains only an inquiry regarding the status of this

3    case and does not contain any request for relief.  That motion is therefore properly stricken from

4    the Court's motion calendar.  Finally, with respect to plaintiff's motion for preliminary

5    injunctive relief (Dkt. 121), the Court notes that at the time plaintiff filed his motion, in which he

6    requests that King County be enjoined from taking his wheelchair, he had been temporarily

7    transferred back into King County custody from the DOC where he has been provided a

8    wheelchair.  However, defendants indicate in their response to plaintiff's motion that plaintiff

9    has now been returned to DOC custody.  (*See* Dkt. 122.)  It therefore appears that plaintiff's

10   request for preliminary injunctive relief is moot.

<u>CONCLUSION</u>

12         Based on the foregoing, this Court recommends that defendants' motion for summary

13   judgment be granted, and that plaintiff's third amended complaint and this action be dismissed

14   with prejudice.  The Court further recommends that defendants' motions to strike be granted in

15   part and denied in part, that plaintiff's motions to proceed to trial, for an extension of time, and

16   for preliminary injunctive relief be denied as moot, and that plaintiff's motion for discovery

17   should be stricken.  A proposed order accompanies this Report and Recommendation.

18         Objections to this Report and Recommendation, if any, should be filed with the Clerk and

19   served upon all parties to this suit by no later than **June 11, 2018**.  Failure to file objections

20   within the specified time may affect your right to appeal.  Objections should be noted for

21   consideration on the District Judge's motion calendar for the third Friday after they are filed.

22   Responses to objections may be filed within **fourteen (14)** days after service of objections.  If no

23

REPORT AND RECOMMENDATION - 23

timely objections are filed, the matter will be ready for consideration by the District Judge on **June 15, 2018.**

This Report and Recommendation is not an appealable order.  Thus, a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge acts on this Report and Recommendation.

DATED this <u>21st</u> day of May, 2018.


_____
JAMES P. DONOHUE
United States Magistrate Judge

REPORT AND RECOMMENDATION - 24